1

2

3

4

5

6

7

8            **UNITED STATES DISTRICT COURT**

9            **EASTERN DISTRICT OF CALIFORNIA**

10

11   THURMAN GAINES,                          )   Case No.: 1:15-cv-00587-NONE-SAB (PC)
                                              )
12                      Plaintiff,            )
                                              )   FINDINGS AND RECOMMENDATION
13          v.                                )   FOLLOWING <u>ALBINO</u> HEARING
                                              )   RECOMMENDING DISMISSAL OF ACTION,
14   CALIFORNIA DEPT. OF CORRECTIONS          )   WITHOUT PREJUDICE, FOR FAILURE TO
     et al.,                                  )   EXHAUST THE ADMINISTRATIVE REMEDIES
15                                            )
                        Defendants.           )
16                                            )
                                              )
17   _____ )

18          Plaintiff Thurman Gaines is proceeding *in forma pauperis* in this civil rights action pursuant to

19   42 U.S.C. § 1983.

20                                            **I.**

21                              **PROCEDURAL BACKGROUND**

22          This action has a lengthy procedural history.  Plaintiff filed this action on April 16, 2015.  (ECF

23   No. 1.)  On August 28, 2015, the matter was reassigned to Chief Judge Ralph R. Beistline for all

24   proceedings.  (ECF No. 9.)  On October 10, 2015, a screening order was filed dismissing Plaintiff's

25   complaint for failure to state a claim and granting Plaintiff an opportunity to file an amended complaint

26   by October 30, 2015.  (ECF No. 10.)

27          After being granted several extensions of time, Plaintiff filed an amended complaint on February

28   5, 2016.  (ECF No. 15.)  On February 11, 2016, an order issued dismissing the federal claims for failure

1

to state a claim and granting Plaintiff leave to file a second amended complaint by March 31, 2016. (ECF No. 16.)

Plaintiff filed a second amended complaint on April 11, 2016.  (ECF No. 19.)  On April 14, 2016, a screening order was filed finding that Plaintiff's second amended complaint stated a deliberate indifference claim against Dr. E. Horowitz ("Defendant").  (ECF No. 20.)  Defendant filed a waiver of service and an answer was filed on August 18, 2016.  (ECF Nos. 25, 27.)  A discovery and scheduling order issued on this same date.  (ECF No. 28.)  The scheduling order was amended on September 9, 2016 and November 3, 2016.  (ECF Nos. 30, 34.)

On November 1, 2016, Defendant filed a motion to compel and a request for an extension of time to file a motion regarding exhaustion until after Plaintiff responded to discovery.  (ECF Nos. 32, 33.)  On November 3, 2016, Defendant's request for an extension of time was granted.  (ECF No. 34.) On December 14, 2016, this matter was reassigned to Chief Judge Lawrence J. O'Neill and Magistrate Judge Stanley A. Boone.  (ECF No. 36.)

On December 17, 2016, Defendant filed a motion to modify the scheduling order.  (ECF No 37.) On July 14, 2017, Defendant's motion to compel was granted in part and denied in part and the motion to amend the scheduling order was granted.  (ECF No. 38.)  A new discovery and scheduling order issued.  (ECF No. 39.)

On August 24, 2017, Defendant filed a motion for sanctions based on Plaintiff's failure to comply with the July 14, 2017 order.  (ECF No. 40.)  On September 18, 2017, Plaintiff filed a notice of voluntary dismissal.  (ECF No. 42.)  On September 21, 2017, findings and recommendations issued recommending granting Plaintiff's motion for dismissal contingent upon him producing the requested discovery.  (ECF No. 43.)  On October 17, 2017, the findings and recommendations was adopted and Plaintiff was ordered to produce the discovery and file a notice of compliance within thirty days at which time the matter would be dismissed without prejudice and that if Plaintiff failed to comply the matter would be dismissed with prejudice.  (ECF No. 44.)  On November 13, 2017, Plaintiff filed a motion for an extension of time which was granted.  (ECF Nos. 45, 46.)  On December 7, 2017, Plaintiff filed a notice of compliance and a motion for withdrawal of his voluntary dismissal of this action.  (ECF Nos. 47, 48.)

On December 18, 2017, Defendant filed a second motion for sanctions.  (ECF No. 49.)  On December 20, 2017, Defendant's August 24, 2017 motion for sanctions was denied without prejudice. (ECF No. 50.)   On March 22, 2018, a findings and recommendations issued recommending that evidentiary sanctions be issued for Plaintiff's failure to provide discovery and to comply with the orders that he produce supplemental discovery responses.  (ECF No. 59.)  Plaintiff filed objections and on April 9, 2018, an order was filed adopting the findings and recommendations in part and finding that terminating sanctions were appropriate, the action was dismissed, and judgment was entered against Plaintiff.  (ECF Nos. 60, 61, 62.)

On April 20, 2018, Plaintiff filed a notice of appeal which was forwarded to the Ninth Circuit. (ECF Nos. 65, 66.)  On December 3, 2018, the Ninth Circuit reversed the imposition of terminating sanctions and a mandate issued on April 2, 2019.  (ECF Nos. 71, 72.)  On April 4, 2019, an amended scheduling order issued.  (ECF No. 73.)

On May 10, 2019, Defendant filed a motion for summary judgment on non-exhaustion grounds. he instant motion for summary judgment.  (ECF No. 77.)  After receiving an extension of time, Plaintiff filed an opposition on July 1, 2019.  (ECF No. 81.)  After receiving an extension of time, Defendant filed a reply on July 19, 2019.  (ECF No. 84.)

On September 6, 2019, the undersigned issued Findings and Recommendations recommending that Defendants' motion for summary judgment denied, without prejudice, and the matter be set for an Albino hearing.  (ECF No. 87.)  On October 7, 2019, Defendant filed objections.  (ECF No. 90.)  On November 1, 2019, Plaintiff filed objections, and Defendant filed a response on November 14, 2019. (ECF Nos. 92, 93.)

On January 15, 2020, the Findings and Recommendations were adopted in full, and Defendants' exhaustion related motion for summary judgment was denied, without prejudice.   (ECF No. 94.)  The Court found that material disputes of fact exist whether Plaintiff filed an administrative appeal grieving Defendant's denial of a lower tier and lower bunk chrono.  (Id.)

On September 15, 2020, the Court set the matter for an evidentiary hearing.  (ECF No. 96.)

On September 30, 2020, Plaintiff filed motions for the attendance of witnesses.  (ECF Nos. 97-102.)  On October 8, 2020, Defendant filed an opposition to Plaintiff's motions.  (ECF No. 104.)

1    On October 16, 2020, the Court granted Plaintiff's motion for the attendance of witnesses

2    Cooper and Harris, and denied his motions for witnesses Sanchez and Robancho.  (ECF No. 105.)

3    On January 14, 2021, an evidentiary hearing was conducted before the undersigned, in which

4    the evidence and witness testimony was heard and admitted.  (ECF No. 123.)

5    On March 1, 2021, both parties filed supplemental briefs following the Albino hearing.  (ECF

6    Nos. 129, 130.)  On March 8, 2021, Defendant filed a reply to Plaintiff's brief.  (ECF No. 131.)

7    On March 8, 2021, Plaintiff filed a motion for a seven day extension of time to file a reply to

8    Defendant's supplemental brief.  (ECF No. 132.)  On March 9, 2021, the Court granted Plaintiff's

9    request.  (ECF No. 133.)

10   On March 10, 2021, the Court granted Defendant seven days from the date Plaintiff files a

11   reply to file a response thereto.  (ECF No. 135.)

12   On March 15, 2021, Plaintiff filed a reply to Defendant's supplemental brief.  (ECF No. 136.)

13   On March 22, 2021, Defendant filed a response to Plaintiff's reply.  (ECF No. 137.)

## II.

## ALLEGATIONS OF COMPLAINT

16   At the time of the incidents alleged in the complaint, Plaintiff was sixty-one years old and

17   suffered from back pain in the lumbar spine; arthritis in both hips, the left foot, and knees; hypertension;

18   hepatitis C; sleep apnea; and had a learning disability.  Plaintiff also ambulated with the use of a cane.

19   Defendant Horowitz was Plaintiff's primary care physician while he housed at Mule Creek State Prison

20   ("MCSP").

21   Around June 30, 2014, Plaintiff fell while exiting his cell.  His lower back and legs were numb

22   and Plaintiff was unable to get up off the floor.  Plaintiff was initially treated by Dr. Rudas and requested

23   a chrono for ground floor housing and a lower bunk which was denied.

24   Plaintiff was seen by Defendant on July 3, 2014 for a follow-up appointment.  Plaintiff asked

25   Defendant to initiate a chrono for ground floor housing and a lower bunk.  Defendant responded that

26   she could not do anything about Plaintiff's housing because it was up to custody staff.  Defendant

27   prescribed medication and referred Plaintiff to physical therapy.

28   ///

4

Around July 20, 2014, Plaintiff's left side went numb and he collapsed while he was going down the stairs.  Plaintiff sought the assistance of another inmate to file an administrative appeal, but it disappeared and he did not see it again.

Plaintiff was transported to Sutter Amador Hospital.  Plaintiff filed a separate administrative appeal grieving Defendant's interference with his prescribed medication.  On July 23, 2014, Defendant saw Plaintiff for a follow-up and Plaintiff was given a chrono for ground floor housing and a lower bunk, along with a single point cane, mobility vest, and no stairs.

On August 6, 2014, Defendant interviewed Plaintiff regarding Plaintiff's appeal that Defendant had interfered with his medication.  Defendant reminded Plaintiff that she had granted his request for ground floor housing and a lower bunk chrono and the appeal was granted in part.  Plaintiff attempted to address the chrono issue in his appeal regarding the denial of medication but was informed that he could not add any new issues.  Plaintiff sought the advice of other inmates who told him that he did not need to further appeal the chrono issue because his request had been granted.

**III.**

**LEGAL STANDARD FOR FAILURE TO
EXHAUST ADMINISTRATIVE REMEDIES**

The Prison Litigation Reform Act (PLRA) of 1995, requires that prisoners exhaust "such administrative remedies as are available" before commencing a suit challenging prison conditions."  42 U.S.C. § 1997e(a); see Ross v. Blake, 136 S. Ct. 1850 (June 6, 2016) ("An inmate need exhaust only such administrative remedies that are 'available.' ").  Exhaustion is mandatory unless unavailable.  "The obligation to exhaust 'available' remedies persists as long as some remedy remains 'available.'  Once that is no longer the case, then there are no 'remedies . . . available,' and the prisoner need not further pursue the grievance."  Brown v. Valoff, 422 F.3d 926, 935 (9th Cir. 2005) (emphasis in original) (citing Booth v. Churner, 532 U.S. 731, 739 (2001)).  This statutory exhaustion requirement applies to all inmate suits about prison life, Porter v. Nussle, 534 U.S. 516, 532 (2002) (quotation marks omitted), regardless of the relief sought by the prisoner or the relief offered by the process, Booth, 532 U.S. at 741, and unexhausted claims may not be brought to court, Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter, 534 U.S. at 524).

The failure to exhaust is an affirmative defense, and the defendant bears the burden of raising and proving the absence of exhaustion. Jones, 549 U.S. at 216; Albino v. Baca, 747 F.3d 1166 (9th Cir. 2014). "In the rare event that a failure to exhaust is clear from the face of the complaint, a defendant may move for dismissal under Rule 12(b)(6)." Albino, 747 F.3d at 1166. Otherwise, the defendants must produce evidence proving the failure to exhaust, and they are entitled to summary judgment under Rule 56 only if the undisputed evidence, viewed in the light most favorable to the plaintiff, shows he failed to exhaust. Id.

Defendant must first prove that there was an available administrative remedy and that Plaintiff did not exhaust that available remedy. Williams v. Paramo, 775 F.3d 1182, 1191 (9th Cir. 2015) (citing Albino, 747 F.3d at 1172) (quotation marks omitted). The burden then shifts to Plaintiff to show that something in his particular case made the existing and generally available administrative remedies effectively unavailable to him. Williams, 775 F.3d at 1191 (citing Albino, 747 F.3d at 1172) (quotation marks omitted). The ultimate burden of proof on the issue of exhaustion remains with Defendant. Williams, 775 F.3d at 1191 (quotation marks omitted).

Where "summary judgment is not appropriate," as to the issue of exhaustion "the district judge may decide disputed questions of fact in a preliminary proceeding." Albino, 747 F.3d at 1168. Whenever feasible, such questions of fact should be "decided before reaching the merits of a prisoner's claim." Id. at 1170. "If the district judge holds that the prisoner has exhausted available administrative remedies, that administrative remedies are not available, or that a prisoner's failure to exhaust available remedies should be excused, the case may proceed to the merits." Id. at 1171.

Furthermore, one of the purposes of an evidentiary hearing is to enable the finder of fact to evaluate the credibility of witnesses by seeing "the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice. . . ." United States v. Mejia, 69 F.3d 309, 315 (9th Cir. 1995). It is only in rare instances that "credibility may be determined without an evidentiary hearing" on the documentary testimony and evidence in the record. Earp v. Ornoski, 431 F.3d 1158, 1169–70 (9th Cir. 2005).

In arriving at these Findings and Recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses

thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence deemed admissible, material, and appropriate.

**IV.**

**ANALYSIS AND FINDINGS ON EXHAUSTION OF ADMINISTRATIVE REMEDIES**

This action is proceeding against Defendant Dr. Horowitz for failure to provide Plaintiff with an accommodation for a lower-tier, lower-bunk housing assignment, despite his alleged request for such accommodation. In the order denying Defendant's motion for summary judgment, it was determined that an issue of fact existed regarding whether prison officials prevented Plaintiff from exhausting his administrative remedies by losing and failing to process the administrative appeal of Defendant's denial of Plaintiff's request for a lower tier and lower bunk chrono that Plaintiff states he submitted on July 21, 2014.

The undersigned conducted an evidentiary hearing on January 14, 2021, by video conference. Plaintiff was present and represented by Robert Flynn and Defendant was represented by Jeremy Duggan. The Court heard testimony from Plaintiff, inmate Victor Cooper, Darrell Harris, Eric Gruenwald, Ashley Altschuler, Michael Slusher, Justin Charon, Pearl Brown, and Melvin Allen. The following exhibits were admitted into evidence: Plaintiff's Exhibits 6, 11, 14, 19, and 20, and Defendant's Exhibits A, G, H, I, O, P, Q, S, T, W, X, Y, and Z.

**A. Summary of Relevant Testimony**

The Court summarizes the relevant testimony presented at the evidentiary hearing.

**Plaintiff:** In July 2014, Plaintiff was living in building 13 second level at MCSP. (Reporter's Transcript (hereinafter "RT") 133.) After Plaintiff fell a second time while going down the stairs from the second tier prison cell, he decided to file a grievance against Defendant Dr. Horowitz for failure to provide a lower bunk and lower tier accommodation. (RT 136-137.) Because Plaintiff cannot read or write, sometime in late July (approximately four or five days after his second fall), Plaintiff requested the assistance of fellow inmate Victor Cooper in preparing a grievance against Defendant Dr.

Horowitz.  (RT 137-138.)  Mr. Cooper went to Plaintiff's building 13 section C, and the two sat a table while Cooper assisted Plaintiff in filling out the grievance form requesting a second level tier placement.  (RT 138-140.)  Plaintiff observed Mr. Cooper play the grievance in mailbox, but he never got a receipt.  (RT 138, 141, 145.)  Approximately a week or two after the grievance was placed in the mailbox, Plaintiff was transferred to a different institution.  (RT 143.)

**Victor Cooper:** In the summer of 2014, Victor Cooper was housed in facility C, building 14 cell 104 at MCSP.  (RT 12.)  Plaintiff approached Mr. Cooper for assistance with his legal work regarding after he had fallen and injured himself.  (RT 13.)  On or about July 21, 2014, Mr. Cooper went to building 13 section C to assist Plaintiff with writing a grievance (CDCR 602) relating to a fall.  (RT 13-14, 16, 29-30.)  It was requested that Plaintiff be moved to a lower bunk, lower tier, permanent assignment.  (RT 15.)  Plaintiff signed and dated the grievance.  (RT 16.)  Mr. Cooper then put the grievance into an envelope addressed to the appeal's coordinator and placed it in the grievance mailbox.  (RT 18.)  He specifically put "it in the legal mail mailbox, which is the 602s, to the left of the sally port, which is a grill gate to go out into a hallway to go out the door of the building."  (RT 18:3-5.)

**Darrell Harris:** Mr. Harris agreed to assist Plaintiff with some legal problems after Plaintiff had fallen down some stairs and hurt himself.  (RT 53.)  Sometime in December 2014 and January 2015, Mr. Harris helped Plaintiff prepare the filing of the instant lawsuit.  (RT 54-55.)  On January 2 or 3, 2015, Mr. Harris searched Plaintiff's personal property for the missing grievance, but he did not file the grievance or a receipt.  (RT 54-55, 58.)  Before he filed the complaint in this action, Mr. Harris asked Mr. Cooper if he filled out and turned in a grievance regarding Plaintiff's claim against Horowitz.  (RT 74.)  Mr. Harris believed a grievance was written by Cooper in July 2014, and it would be produced at a later time.  (RT 73-75.)  Mr. Harris stated his belief a grievance was filed was based on "another medical request, it was very well stated that he had been given his lower bunk, that he had been given a cane and that he had been given proper medication and that his appeal was exhausted.  So knowing the two are connected, I very well believed that this situation had been completed."  (RT 76.)  Mr. Harris pointed to a first level response issued in medical appeal number MCSP-HC-14045270, dated August 19, 2014, stating "[t]hey answered it on the first level response, meaning they had reason

8

to believe that this cane, lower bunk and lower tier, which he was requesting, was, in fact, written on a 602 they granted." (RT 80-81; Defs.' Ex. Q at p. 7.)

**Eric Gruenwald:** In the summer of 2014, Mr. Gruenwald worked as a correctional officer in facility C building 13 at MCSP. (RT 83.) During this time, Mr. Gruenwald typically worked with officer Mayberry on the second watch shift from 6:00 a.m. to 2:00 p.m. (RT 84.) On July 21, 2014, Plaintiff was assigned to facility C building 13. (RT 85.) On this same day, officer Rinehart worked in the control booth of facility C building 13. (Id.) Officer Mayberry was not working on July 21, 2014. (RT 86.)

In July 2014, it was officer Gruenwald's duty to keep track of the movements of inmates inside the building. (RT 87.) Officer Gruenwald has no recollection of Plaintiff. (Id.) It was not part of officer Gruenwald's duties to update or prepare daily movements sheets. (Id.) In 2014, the control booth officer is in charge of maintaining the logbook which records all the movements of individuals going in and out of the prison or moving to other buildings. (RT 87, 89.) In 2014, inmates were required to place grievances in the inmate appeals box. (RT 90.) Sergeants had the key to the inmate appeals box, and the box was emptied during the first watch which are then taken to the appeals coordinator. (RT 93, 96.)

In July 2014, it was the policy of CDCR to not allow inmates to travel from one building to another building. (RT 98.) If an inmate had moved from one building to another building a record of the movement would be noted on the building logbook by the control officer. (RT 98.) There were scheduled unlocks for medication, yard release, dining release, etc. (RT 99-100.) It was against policy for one inmate to enter a building that he did not live in. (RT 100.) Officer Gruenwald acknowledged that California Code of Regulations, title 15, section 3163, allows inmates to help other inmates. (RT 101-102, Pl.'s Ex. 11.)

**Rickey Lee Rinehart:** In July 2014, Mr. Rinehart was a control booth officer at MCSP in building 13. (RT 105.) In July 2014, Mr. Rinehart was responsible for maintaining the logbook. (RT 106.) Officer Rinehart acknowledged that the logbook was "comprehensively accurate as far as everyone that left or entered building 13." (RT 107.) All inmate movement was accountable. (RT 108.) Officer Rinehart never allowed another inmate to go into a building in which he did not live to

9

assist another inmate with legal work.  (RT 109.)   It was a common policy due to safety and security issues to not allow inmates from a different building to enter another building that they did not live in.  (RT 114.)  Rinehart does not recall at time when a Men's Advisory Committee (MAC) chairman asked to enter a different building to assist another inmate.  (RT 115.)  Rinehart was not allowed to allow Mr. Cooper in building 13 to assist Plaintiff as it would put the housing unit in jeopardy of safety and security.  (RT 123-124.)

**Ashley Altschuler:** From February 2013 to December 2014, Ashley Altschuler was a health care appeals coordinator at MCSP.  (RT 165.)  She was responsible for tracking, reviewing and determining processing of all health care appeals under Title 15 and the Department of Operations Manual (DOM).  (RT 165.)  Inmates filed CDCR 602 health care grievances if they had a disagreement with services that were received or denied.  (RT 166.)  The inmate would put the appeal in an envelope and place it in the secured health care appeals box located within each housing unit.  (RT 176.)  After a health care appeal was filed, an inmate would receive a letter of acceptance, rejection or cancellation.  (RT 167.)  The 602 would be initially reviewed to determine if there were any emergency circumstances.  (RT 166.)  Then it would be tracked and input into the health care appeals tracking system, also known as HCART.  (RT 166.)  It would then be reviewed for processing and either accepted or rejected based on the DOM and Title 15.  (RT 166.)  If accepted, it would be assigned to a provider or nurse assistant for interview.  (RT 166.)  After the patient was interviewed, the grievance would be returned to the office for formal response and returned to the inmate.  (RT 166.)  If the inmate was dissatisfied with the formal response, he could file an appeal at the second level of review and third level review.  (RT 166-167.)  In 2014, an inmate could follow up on a health care appeal if no response was received by submitting a Form 22 health care correspondence to the health care grievance or appeals office.  (RT 167.)

In 2014, appeals that were received by the health care appeals office were logged into the HCART at the time of receipt. (RT 171.)  The appeals office at MCSP received three health care appeals from Plaintiff.  (RT 172, Defs.' Ex. O.)  The first health care appeal, HC 14045270, was received on July 10, 2014 at the first level of review.  (RT 173, Defs.' Ex. Q.)  The second appeal, HC 14045231, was rejected at the first level of review on June 19, 2014.  (RT 173.)  The third appeal, HC

14045188, was canceled at the first level of review on June 11, 2014.  (RT 173.)  There are no appeals logged received after July 10, 2014.  (RT 173.)  In submitting HC 14045270 to the second level appeal, Plaintiff stated, in part, Dr. Horowitz had me on the top tier when I should have been on the lower tier before I fell and hurt my back and finger."  (RT 175-176, Defs.' Ex. Q.)

A health care Form 7362 is used to request health care services, and a CDCR 602 is used to dispute health care services that were received or denied.  (RT 177.)  Plaintiff submitted a Form 7362 request on July 22, 2014.  (RT 177, Defs.' Ex. S.)  Plaintiff stated he "was just in TTA for falling while going up the stairs and I'm still on the upper tier.  I have a cane and the issue is that I need my lower lower [sic] chrono before another incident can occur and I get hurt worse than I just did please schedule me for a PCP appointment."  (Defs.' Ex. S.)  Altschuler acknowledged that inmates have reported appeals being lost.  (RT 179.)

**Michael Slusher:** Correctional counselor Michael Slusher testified that as a grievance specialist he would process non-health care staff misconduct claims.  (RT 185-187.)  He would disseminate the severity and then distribute the grievance to be processed by the proper department.  (RT 186.)  The inmate would fill out the CDCR 602 and place it in the inmate appeals box.  (RT 186.)  In 2014, there were there separate levels to the appeals process, and the appeal was considered exhausted at the third director's level review.  (RT 187.)  In 2014, an inmate could follow up on appeal and lack of response by filing out a Form 22 or speak to a sergeant regarding the status of the appeal.  (RT 187.)  If an inmate submitted a Form 22 or CDCR 602 saying he did not receive a response to the first CDCR 602, the appeals office would allow the inmate to refile the non-health care 602 and restart the appeal review process.  (RT 187.)  In July 2014, all non-health care custody appeals were logged into the inmate appeal tracking system (IATS) database when received.  (RT 188.)  The IATS showed that there was no appeal submissions by Plaintiff at MCSP.  (RT 190, Defs.' Ex. P.)  Slusher acknowledged that if an inmate appeal was lost or misplaced it would not be logged into the system.  (RT 193.)

**Justin Charon:** In July 2014, Justin Charon was a correctional lieutenant at MCSP.  (RT 199.)  On July 21, 2014, he worked from 10:00 p.m. to 6:00 a.m. the next morning, as the watch commander.  (RT 200.)  The watch commander is in charge of prison safety when the warden is away.  (RT 200.)

1   He would confirm that all CDCR 602 forms were brought to his office which was documented on the

2   daily activity report (DAR).  (RT 200-201, Defs.' Ex. T.)  On the night of July 21, 2014, all Facility C

3   appeals were collected and taken to his office by sergeant Brown at 2235 hours.  (RT 202.)  Charon

4   would keep the appeals in the watch commander's office until picked up by the appeals office the

5   following morning.  (RT 202-203.)  In July 2014, in Facility C, building 13, if an appeal was placed in

6   the mail and not in the appeals box, the security patrol officer would separate the mail when it was

7   collected and put the appeal in the appeals box.  (RT 203.)

8       **Pearl Brown:**  In July 2014, Pearl Brown was a Facility C program sergeant.  (RT 210.)  He

9   worked first watch which ended at 6:00 a.m. (RT 210.)  During this time, Brown's duties included

10  supervising staff and conducting nightly tours.  (RT 210.)  He would conduct inventory checks, collect

11  602 appeals, sign post orders, sign logs, and provide OJT.  (RT 210-211.)  To collect the appeals, he

12  would unlock the appeals box in each building and collect the 602 appeals and sign the logs.  (RT

13  211.)  He would then take the appeals to the watch commander's office and put them on his desk.  (RT

14  211.)  The correctional sergeants for each yard maintained the keys for the appeals lock box.  (RT

15  211.)

16      Brown worked the night of July 21 to July 22, 2014, and collected the 602 appeals from

17  Facility C, buildings 11, 12, 13, 14, 15, and took them to the watch commander's office which was

18  recorded on the DAR.  (RT 213-214, Defs.' Ex. T.)  At some point in time, CDCR policy changed

19  from putting grievances in a wooden intersystem mailbox to a locked metal box to separate the mail

20  from 602s.  (RT 217-219.)

21      **Melvin Allen:**  In July 2014, Melvin Allen was a watch commander at MCSP and worked

22  from 6:00 a.m. to 2:00 p.m.  (RT 221.)  His primary duties included the overall administration of

23  things in the central service area until more senior administrators were on duty.  (RT 221.)  The 602

24  appeals were picked up from his office by the appeals coordinator.  (RT 221.)

25      On July 22, 2014, Allen was the watch commander for the central service.  (RT 223, Defs.' Ex.

26  Z.)  The DAR reflected that the appeals coordinator picked up the appeals from the watch

27  commander's office on July 22, 2014, to be taken to the appeals office.  (RT 223-225, Defs.' Ex. T.)

28  Allen acknowledged that inmates have alleged that appeals have been lost.  (RT 226.)

1    **B.    Findings of Fact and Analysis**

2           Plaintiff contends that administrative remedies were unavailable because he and inmate Cooper

3    submitted a grievance form on July 21, 2014, but never received a response.

4           Failure to exhaust may be excused where the administrative remedies have been rendered

5    "unavailable," and in such a case, the plaintiff bears the burden of demonstrating that the grievance

6    process was unavailable to him through no fault of his own.  Sapp v. Kimbrell, 623 F.3d 813, 822-23

7    (9th Cir. 2010); see also Ward v. Chavez, 678 F.3d 1042, 1044-45 (9th Cir. 2012) (exhaustion excused

8    where futile); Nunez v. Duncan, 591 F.3d 1217, 1224 (9th Cir. 2010) (warden's mistake rendered

9    prisoner's administrative remedies "effectively unavailable"); Brown v. Valoff, 422 F.3d at 939-40

10   (plaintiff not required to proceed to third level where appeal granted at second level and no further relief

11   was available).  Aside from this single exception, "the PLRA's text suggests no limits on an inmate's

12   obligation to exhaust—irrespective of any 'special circumstances.'… [a]nd that mandatory language

13   means a court may not excuse a failure to exhaust, even to take such circumstances into account."  Ross,

14   136 S. Ct. at 1856.

15          The test for deciding whether a grievance procedure was unavailable uses an objective standard.

16   Albino, 697 F.3d at 1035.  "[A]ffirmative actions by jail staff preventing proper exhaustion, even if done

17   innocently, make administrative remedies effectively unavailable."  Id. at 1034.  An inmate may

18   demonstrate the unavailability of remedies by showing "(1) that jail staff affirmatively interfered with

19   his ability to exhaust administrative remedies or (2) that the remedies were unknowable."  Id. at 1033.

20   The inmate must make "a good-faith effort" to determine and comply with a prison's grievance

21   procedures.  Id. at 1035.

22          Plaintiff submits that Victor Cooper, himself, and Darrell Harris' testimony confirmed that Mr.

23   Cooper submitted the 602 on Plaintiff's behalf on or about July 21, 2014.   Plaintiff argues that Mr.

24   Cooper provided credible, detailed testimony despite the number of years that have passed, that he

25   helped Plaintiff prepare a 602 and that he filed it in the metal grievance box.  (RT 12.)  Mr. Cooper

26   testified that not long after he heard Plaintiff had fallen and injured himself, Plaintiff approached him

27   about preparing a 602 grievance.  (RT 13.)  On or about July 21, 2014, Mr. Cooper went to building

28   13 section C to assist Plaintiff with writing a grievance (CDCR 602) relating to the fall.  (RT 13-14,

16, 29-30.)  It was requested that Plaintiff be moved to a lower bunk, lower tier, permanent assignment.  (RT 15.)  Plaintiff signed and dated the grievance.  (RT 16.)  Mr. Cooper then put the grievance into an envelope addressed to the appeal's coordinator and placed it in the grievance mailbox.  (RT 18.)  He specifically put "it in the legal mail mailbox, which is the 602s, to the left of the sally port, which is a grill gate to go out into a hallway to go out the door of the building."  (RT 18:3-5.)  Plaintiff contends his own testimony confirmed Mr. Cooper's version of events.  (RT 133-140.)

Darrell Harris was not at MCSP in July 2014, but testified that he later assisted Plaintiff in searching his property for the alleged grievance to no avail.  (RT 54-55.)  Harris also testified that he helped Plaintiff draft the original complaint in this action, and he made the decision to proceed with the lawsuit despite not having a copy of the relevant grievance.  (RT 54-55, 72-76.)

First, despite the testimony by Plaintiff, Victor Cooper, and Darrell Harris, no contemporaneous documents demonstrate that Plaintiff filed a relevant grievance in July 2014.  MCSP prison officials Brown, Charon, Slusher, and Allen all testified as to the procedure if a grievance was prepared and submitted by Plaintiff and Cooper.  (RT 186-188, 200-203, 213-214, 221-225.)  Sergeant Brown specifically testified that if Plaintiff and/or inmate Cooper had submitted a non-health care grievance and placed it in the appeals box in Facility C, building 13, at MCSP on July 21, 2014, it would have been collected that night and taken to the watch commander's office.  (RT 213-214.)  The appeal would then have been taken to the appeals office to be logged in the IATS.  (RT 187-188, 202-203, 224-225.)  Defendant submitted evidence that the appeals in the Facility C appeals boxes were picked up the night of July 21-22, 2014, taken to the watch commander's office, and then taken to the appeals office the next day.  (RT 202-203, 213-214, 224-225, Defs.' Ex. T.)  However, there is no record or evidence of the appeals office receiving the alleged July 21, 2014, non-health care grievance filed by Plaintiff.  (RT 188-191, Defs.' Ex. P.)  Furthermore, there is no record or evidence of Plaintiff having filed any non-health grievances while at MCSP.  (Id.)

Plaintiff argues that Harris "expected the 602 would show up in discovery" and did not need to follow up on it.  (ECF No. 136 at 9.)  Assuming the grievance was discovered in discovery, it is clear that it would still need second and third level review.  Harris testified that he believed the grievance

had been submitted in July 2014 and by November 2014, it had been long enough to go through the exhaustion process.  (RT 72-76.)  In response to the question if there was any other basis upon which he thought the exhaustion process was complete behind the lapse of "appropriate time," Harris testified that "[i]n another medical request, it was very well stated that he had been given his lower bunk, that he had been given a cane and that he had been given proper medication and that his appeal was exhausted.  So knowing the two are connected, I very well believed that this situation had been completed."  (RT 75-76.)  However, Harris (who assisted Plaintiff in drafting the complaint in this action) acknowledged having filed "many 602s" and was familiar with the administrative process (RT 75), yet he did not follow up (or advise Plaintiff to follow up) on the alleged grievance filed in July 2014, despite knowing the initial grievance could not located and there was no information or evidence that the grievance was presented to the necessary second and third levels of review.  Accordingly, there are no contemporaneous documents to support the finding Plaintiff filed a grievance on July 21, 2014.

Second, there is no evidence to support the finding that inmate Cooper was in Facility C, building 13, on July 21, 2014.  Plaintiff and Cooper testified that they drafted Plaintiff's grievance in the dayroom of building 13, and Cooper placed the grievance in the appeals box.  (RT 14-15, 18, 138-139.)  It was necessary for Plaintiff to rely on Cooper in drafting the grievance because Plaintiff cannot read or write and must rely on others to submit written documents.  (RT 147.)  Floor officer Gruenwald and control booth officer Rinehart worked on July 14, 2014, and testified that it was against policy to allow inmate Cooper to enter building 13 because he did not live there.  (RT 98, 114.)  Gruenwald and Rinehart further testified that if the movement of inmate Cooper was allowed, it would have been documented in the building log book.  (RT 98, 123.)   The building log book does not reflect movement by inmate Cooper.  (RT 122-123, Defs.' Ex. W.)  Plaintiff argues that "Multiple witness [sic] confirmed that CDCR guards do not log every single person entering or leaving" in the log book, citing to officers Gruenwald and Rinehart's testimony.  (ECF No. 136 at 4.)  While the log book did not list every inmate's name with regard to releases for yard, chow, medication, etc., both officers Gruenwald and Rinehart testified that, if an inmate from another building was allowed to enter building 13, such event would have been logged.  (RT 98, 123.)  Officer Gruenwald acknowledged

that the log book did not log every single person who leaves or enters building 13, because it logged general releases without listing every single inmate's entry or exit, and the fact remains that entry of an inmate from another building would have been logged.  Plaintiff mischaracterizes officer Rinehart's testimony with regard to the log book.  When asked what "written guidance" listed what was to be placed in the log book, officer Rinehart responded he would have to refer to his post order.  (RT 106.) Rinehart then stated that the log book was maintained on a day-to-day basis and listed  interactions in the building.  (RT 106.)  Thus, officer Rinehart simply answered the question as to the "written policy" regarding the log book, and testified clearly as to the information maintained in the log book which included entry of an inmate into a building that he did not live in.  Furthermore, Plaintiff and Cooper's testimony is inconsistent as to the date of filing.  Plaintiff testified that Cooper held him with the grievance "four or five days' after his second fall (i.e., July 24 or 25, 2014).  (RT 137-138, 146.) Whereas Cooper testified that the grievance was drafted with Plaintiff on July 21, 2014.  (RT 29.)  In Plaintiff's declaration, drafted by inmate Harris, Plaintiff also listed July 21, 2014, as the date of filing the grievance.  (RT 29, 149-150, Pl.'s Ex. 6.)  Indeed, Plaintiff acknowledges that he had "some difficulty with the precise date of the filing" of the grievance, he argues his declaration, prepared closer to the actual time of the incidents, is accurate.  (ECF No. 130 at 6.)  Plaintiff's declaration was prepared by inmate Harris who relied on statements from inmate Cooper.  (RT 72-76.)  Thus, based on Plaintiff's discrepancy in his testimony and declaration, it appears that the date in the declaration was determined after the fact by inmate Harris, and was not based on Plaintiff's recollections, as reflected at the evidentiary hearing.  Therefore, the inconsistency between Plaintiff and Cooper's testimony hinders their credibility.

Plaintiff contends that Cooper's status as a chairman of the Men's Advisory Committee provided him the ability to enter building 13, is not persuasive.  However, Cooper testified that in 2014 he was not a MAC chairman but rather an "ad hoc."  (RT 36.)  Moreover, control booth officer Rinehart testified that based on security reasons he has never allowed an inmate from another building to go into his building to assist another inmate with a legal issues, irrespective of MAC status.  (RT 114, 130.)  Plaintiff contends officer Rinehart's testimony demonstrates that Cooper could have been

16

in building 13 on July 21, 2014.  (ECF No. 136 at 5.)  The testimony cited by Plaintiff involved a

hypothetical situation in which a MAC representative asked to entire a building and speak to staff:

> Q. Sure. Would it be a possible exception to the rule you said where you would not allow any inmate from another building to enter the building where they don't live if that inmate was a MAC representative or chairman?
>
> A. I could not perceive that – you know, if a MAC representative from a different building approached the building, wanted to come in and speak with staff for some reason in regard to, you know, a matter such as this, that would be one thing.  To come and ask staff.  But I never – I do not recall any time that ever happened.

(RT 115.)  Thus, in this hypothetical situation where a MAC chairman asked to enter a building to

speak to staff, that inmate might be granted entry, but Rinehart never had that happen.  Rinehart

testified unequivocally that he would never allow an inmate to enter a building he did not live in to

assist with legal work.  (RT 114.)  Further, Cooper testified that he simply entered building 13, and

there was no testimony that he ever sought and was granted permission to enter as a MAC.[1]

Accordingly, Rinehart's testimony regarding a hypothetical situation about a request to speak to staff

(which did not happen here) does not refute Rinehart's testimony that Cooper would not have been

allowed in building 13 to assist Plaintiff in drafting a grievance.  In addition, although California Code

of Regulations, title 15, section 3163, states that inmates can assist other inmates in preparation of

legal work, this section specifically states that "no otherwise prohibited contacts or access to

prohibited areas will be permitted because of this regulation."[2]  Cal. Code Regs. tit. 15, § 3163.

Therefore, this regulation does not support Plaintiff's argument that inmate Cooper was allowed to go

from one restricted building to another restricted building.  Thus, the Court does not find Cooper's

---

[1] Furthermore, it is undisputed that in 2014, Cooper was a not a MAC, but was ad hoc.  (RT 36.)

[2] In 2014, this section stated in full, "One inmate may assist another in the preparation of legal documents, but shall not receive any form of compensation from the inmate assisted.  Legal papers, books, opinions and forms being used by one inmate to assist another may be in the possession of either inmate with the permission of the owner.  All papers must be returned to the prospective owners when either inmate is transferred to another institution or when other administrative action prevents direct communications between the inmates.  An inmate may be barred from giving legal assistance to other inmates when violations of regulations and established procedures relate directly to such activities.  An inmate will not be barred from giving or receiving legal assistance for violations of regulations and procedures which are unrelated to providing or receiving legal assistance.  However, no otherwise prohibited contacts or access to prohibited areas will be permitted because of this regulation."  Cal. Code Regs. tit. 15, 3163 (2014).

testimony credible to establish that he was in building 13 on July 21, 2014, to assist Plaintiff in filing a grievance.

Third, Plaintiff's contemporaneous filings belie his claim that he filed a grievance in July 2014. Plaintiff testified that after his second fall on July 20, 2014, he "got spooked because I was scared if I fell from the top part of the stairs, I could have broke my neck or something."  (RT 136.)  Plaintiff therefore decided to file a 602 grievance against Defendant Dr. Horowitz to "[s]top any more damage."  (RT 136.)  However, on July 22, 2014, Plaintiff filed a form 7362 request for services requesting a cane and issuance of a lower chrono before another incident occurs.  (RT 147-148, Defs.' Ex. S.)  Plaintiff testified that another inmate, not Cooper, assisted him with the Form 7362.  (RT 148.) The next day, July 23, 2014, Plaintiff was seen by Dr. Horowitz and issued a lower tier chrono.  (RT 148, Defs.' Ex. Q at 10, Sec. Am. Compl. ¶¶ 23-24.)  At the evidentiary hearing, Plaintiff testified that he filed the grievance with the help of Cooper approximately four to five days after the second fall, i.e. on or about July 24 or 25, 2014, which belies Plaintiff's contention that he filed the grievance to "stop any more damage."  Indeed, by July 24 or 25, 2014, Plaintiff had been granted the requested chrono. Thus, it is clear that Plaintiff filed a Form 7362 which provided Plaintiff the requested relief, and there is no independent evidence that he filed a 602 during this same time frame.  Plaintiff argues that "[i]f [he] was obtaining proper advice from the prison and advisors, he would file both the 602 grievance and the medical health care request."  (ECF No. 136 at 6.)  While it is true that Plaintiff could have filed both  documents, the issue here is whether he actually filed a 602 grievance.  The record clearly establishes that Plaintiff filed a Form 7362 (medical request), but the record does not support the finding that he actually filed a 602 grievance, and the filing of the Form 7362 obviated the needed for filing the grievance.

In addition to filing the Form 7362, Plaintiff also attempted to raise the lower tier issue in a request for second level review in health care appeal number 14045270, dated August 23, 2014, related to his medication.  (RT 175-176, Defs.' Ex. Q.)  In this appeal, Plaintiff claimed that "Dr. Horowitz had me on the top tier when I should have been on the lower tier before I fell and hurt my

finger."  (Id.)[3]  Nonetheless, Plaintiff contends that just a month prior, he filed a non-health care grievance on the same issue.  (RT 136-138.)  However, Plaintiff did not mention the July 2014 grievance in his August filing, or indicate that he had not yet received a response.  Rather, it appears that Plaintiff simply attempted to add the lower tier request to this grievance regarding medication.  Although Cooper's testimony and Plaintiff's declaration indicate that the grievance was submitted on July 21, 2014 (RT 29; Pl.'s Ex. 6), in order to "stop any more damage," the Court finds the credible evidence refutes this contention.  Accordingly, the contemporaneous filings refute Plaintiff's contention that he filed a grievance on July 21, 2014.

Fourth, Plaintiff's actions are not consistent with his claim that he filed the relevant grievance in July 2014.  Plaintiff testified that after he filed the grievance in July 2014, he received a "little piece of paper" in response which could not subsequently be found.  (RT 145.)  However, Plaintiff did not follow up, despite the fact that Plaintiff could have filed another 602, a form 22, or inquired of prison staff as to the status of his grievance.  (RT 187.)

Plaintiff argues that the CDCR witnesses' denial that the prison ever had a problem with lost or misplaced grievances is not credible.  However, Plaintiff's argument is not fully developed and does not contain citations to the applicable record.  Rather, Plaintiff merely references (without citation to the reporter's transcript) that witnesses Altschuler, Slusher, Charon, Brown, and Allen testified regarding lost inmate appeals at MCSP.  (ECF No. 130 at 8.)  Nonetheless, Altschuler, Slusher, Charon, Brown, and Allen all testified that they were not aware of a problem with missing appeals at MCSP.  (RT 179, 191-192, 204, 215, 226-227.)  Plaintiff contends that Defendant cannot establish Plaintiff did not file a grievance based on the "admittedly incomplete records," referring officer Gruenwald's testimony, the establishment of a separate metal box for appeal submission, lack of copy or receipt for a grievance, and misplacement of inmate's property during institutional transfers. (ECF No. 136 at 3.)  Officer Gruenwald responded to the hypothetical question as follows:

> Q. So for example, if a sergeant who is supposed to remove the inmate appeals and take them to their office, if they misplace one, the appeals coordinator would never receive it; fair to say?

---

[3] As stated in the September 6, 2019 Findings and Recommendations, this statement did not serve to exhaust Plaintiff's administrative remedies in this action.  (ECF No. 87.)

1

2          A.  I guess.

3  (RT 97.)  Thus, in this hypothetical situation if a sergeant lost a grievance, Gruenwald simply

4  confirmed that grievance would in fact be lost.  Plaintiff attempts to interpret this testimony to support

5  his argument that misplacement of grievances was common at MCSP, and therefore CDCR's records

6  of appeal filings are "incomplete."  (ECF No. 136 at 3.)  Gruenwald's testimony deals with a

7  hypothetical situation where a grievance was already lost, and he testified specifically that he never

8  heard of a grievance being lost and collection of grievances took place when he was not working.  (RT

9  92-93, 95-96.)  Accordingly, Plaintiff has not established that Gruenwald's testimony supports the

10 finding that CDCR's grievance records were incomplete in 2014.  Further, it is undisputed that there

11 was a locked metal box in building 13 in July 2014 to deposit inmate appeals.  (RT 34.)  Although

12 inmate Cooper testified that the policy regarding submitting Form 22s as receipts for grievances

13 changed in 2020 (RT 38), this testimony does not demonstrate that there was a problem of missing

14 grievances at MCSP in 2014.  There is also no evidence to support Plaintiff's contention that property

15 is lost during transfers between institutions causing a missing grievance problem at MCSP in 2014.

16         The Court declines to review Plaintiff's claim that it would be unjust for the Court to rule

17 against him after excluding witnesses in CDCR's custody, living in the same housing unit as Plaintiff,

18 who had notified Defendant were witnesses to at least the falls.  (ECF No. 130 at 8-9.)  As stated in the

19 Court's January 15, 2020 order, the Ninth Circuit did "not foreclose the imposition of an evidentiary

20 sanction on grounds not actually decided by the Ninth Circuit" (ECF NO. 94 at 4), and therefore the

21 sanction of excluding testimony from Sanchez and Robancho with regard to exhaustion is properly

22 applied.  Based on the law of the case, the Court will not further review this issue.  See Christianson v.

23 Colt Indus. Operating Corp., 486 U.S. 800, 815–16 (1988) (alteration in original) ("As most

24 commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of

25 law, that decision should continue to govern the same issues in subsequent stages in the same case." )

26         At the evidentiary hearing, Plaintiff attempted to enter a 2011 California Office of the

27 Inspector General (OIG) report into evidence.  Defendant objected because Plaintiff had not

28 previously disclosed the exhibit, and the Court declined to receive it.  (RT 161-162.)  Plaintiff now

attempts to admit this exhibit for judicial notice by the Court.  ECF No. 130 at 9-10.)  As an initial matter, the evidence was closed at the end of the hearing on January 14, 2021 (RT 235), and Plaintiff did not seek to reopen the record or lay the foundation for admission of this document.  (ECF No. 130 at 9-10.); see also Love v. Scribner, 691 F.supp.2d 1215, 1234-35 (S.D. Cal. 2009) (granting motion to strike evidence submitted for the first time in post-hearing brief where no request was made to re-open the record).  Thus, Plaintiff is prohibited from submitting this evidence for review.  In any event, the information within this report is not subject to judicial notice.  A court may take judicial notice of facts which are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "[A] part requesting judicial notice bears the burden of persuading the trial judge that the fact is a proper matter for judicial notice."  Newman v. San Joaquin Delta Cmty. Coll. Dist., 272 F.R.D. 505, 516 (E.D. Cal. 2011).  Plaintiff seeks to introduce the report to establish that there were "problems of lost inmate grievances or appeals."  (ECF No. 130 at 9.)  Plaintiff specifically argues the report states that in 2011, CDCR did not provide a "receipt" for inmate/parolee requests," or an "accountable means of delivering appeals."  (Id. at 10.)  However, these statements are not judicially noticeable facts because they are not generally known in this jurisdiction, and they are not capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Although the actual existence and date of the OIG report are judicially noticeable, the conclusions contained therein are not judicially noticeable facts.  Accordingly, the OIG report is not subject to judicial notice under Federal Rule of Evidence 201.

## V.

### CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court finds that Plaintiff did not exhaust the administrative remedies with respect to the claim at issue in this action, i.e. that Defendant Dr. Horowitz was deliberately indifferent to Plaintiff's serious medical needs by failing to provide him with an accommodation for a lower-tier, lower-bunk housing assignment, despite his alleged request for such accommodation.  Defendants has met her burden in demonstrating that there was an available administrative remedy and that Plaintiff did not exhaust that available remedy.  Williams v. Paramo,

775 F.3d at 1191.  Plaintiff has failed to present credible evidence to demonstrate that he filed a grievance and was prevented from exhausting his administrative remedies.  Accordingly, the Court finds that Plaintiff did not exhaust his administrative remedies prior to initiating this action, and HEREBY RECOMMENDS that the action should be dismissed, without prejudice.

This Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with this Findings and Recommendation, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 31, 2021**

_____
UNITED STATES MAGISTRATE JUDGE